United States District Court
Southern District Of Texas
**FILED**

**DEC 2 6 2019**

David J. Bradley, Clerk

United States District Court
Southern District of Texas

**ENTERED**

December 26, 2019

David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | |
|---|---|
| ANA J. PENA | § |
| | § |
| Plaintiff, | § |
| VS. | § CIVIL ACTION NO. 7:19-CV-0005 |
| | § |
| ANDREW SAUL, | § |
| Commissioner of the Social | § |
| Security Administration | § |
| | § |
| Defendant. | § |

## REPORT AND RECOMMENDATION

Plaintiff Ana J. Pena appeals the Administrative Law Judge's ("ALJ") determination that she is not entitled to receive Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI"). Plaintiff raises two overarching claims: (1) that the presiding ALJ was unconstitutionally appointed and (2) that the ALJ's mental residual functional capacity determination was not supported by substantial evidence. (Dkt. Nos. 12, 13).

This case was referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). Having reviewed the submissions by both parties, the administrative record, and the applicable law, the undersigned respectfully recommends that Plaintiff's request to amend her complaint (Dkt. No. 12) be **GRANTED**, Plaintiff's motion for summary judgment (Dkt. No. 12) be **DENIED**, that the Commissioner's motion for summary judgment (Dkt. No. 18) be **GRANTED**, that the Commissioner's decision be **AFFIRMED**, and this case be **DISMISSED**.

# I.   BACKGROUND

## A.   Procedural History

On August 20, 2015, Plaintiff filed an initial claim for disability, alleging that she suffered from the following impairments: (1) lumbar back arthritis, (2) pinched nerves from the neck to ankles, (3) plantar fasciitis, (4) depression and anxiety, and (5) carpal tunnel syndrome in the left hand. (Dkt. No. 8-4 at 2-3). On January 6, 2016, Plaintiff's applications for DIB and SSI were completed.[1] (Dkt. No. 8-6 at 2, 10).

The Social Security Administration denied Plaintiff's application on July 7, 2016, and again upon reconsideration on August 18, 2016. (Dkt. No. 8-3 at 16; Dkt. No. 8-5 at 2, 7). Plaintiff filed a written request for hearing and on December 7, 2017, ALJ Osly F. Deramus held a video hearing in Plaintiff's case. (Dkt. No. 8-3 at 16). The ALJ issued a Notice of Decision on February 16, 2018, finding that Plaintiff was not entitled to DIB or SSI. (Dkt. No. 8-3 at 13-26). The ALJ found that Plaintiff is not disabled under 20 C.F.R. § 404.1520(g) and § 416.920(g). (*Id.* at 26).

Plaintiff requested review of the ALJ's decision with the Appeals Council; however, the Appeals Council denied Plaintiff's request for review on September 22, 2018. (Dkt. No. 8-3 at 2-5). On November 20, 2018, Plaintiff filed a complaint with this Court. (Dkt. No. 1 at 3).

## B.   Summary of the Pleadings

Plaintiff moves for summary judgment and raises two overarching issues. First, Plaintiff argues that her "case was adjudicated by an improper and unconstitutionally appointed ALJ, and should be remanded for a new hearing with a different and constitutionally appointed ALJ." (Dkt.

---

[1] Disability insurance benefits are governed by Title II, 42 U.S.C. § 423 *et seq.*, and supplemental security income benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the Social Security Act, but the determination of disability is the same for both. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) ("The law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI."); *Ventura v. Colvin*, No. 6:16-CV-16, 2017 WL 1397130, at *5 (S.D. Tex. Feb. 27, 2017).

No. 12).  Specifically, Plaintiff asserts that the presiding ALJ was appointed in violation of the Appointments Clause, relying on *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051 (2018).  (Dkt. No. 13 at 19).

Second, Plaintiff argues that the ALJ's mental residual functional capacity determination was not supported by substantial evidence for multiple reasons.  (Dkt. No. 12).  Plaintiff argues that the ALJ failed (1) to appropriately weigh the opinion of Dr. De Ferreire; (2) to explain what portions of Dr. De Ferreire's opinion he incorporated into Plaintiff's RFC; (3) to explain how Plaintiff's social limitations will be accommodated by experiencing only occasional contact with coworkers or the public; and (4) by giving a defective hypothetical question to the vocational expert.  (Dkt. No. 13 at 12-13, 17-19).  Plaintiff challenges the ALJ's determination only with respect to the mental disability determination.

Defendant argues that Plaintiff waived her Appointments Clause claim because she did not raise it before the agency at any point in the administrative proceedings and that the ALJ's decision is supported by substantial evidence.  (Dkt. No. 14).  Defendant also moves for summary judgment.  (Dkt. No. 18).

## II.   APPOINTMENTS CLAUSE VIOLATION

Plaintiff claims that the "ALJ that heard Plaintiff's application was unconstitutionally appointed" in violation of the Appointments Clause[2] and that "Plaintiff's application should be immediately remanded for a new hearing with a different and constitutionally appointed ALJ . .

---

[2] "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

. ." (Dkt. No. 13 at 19).  The Commissioner responds that Plaintiff has waived this claim because she did not raise it at the administrative level.  (Dkt. No. 14 at 7).

### A.      Leave to Amend

Plaintiff first raised this claim in her motion for summary judgment, filed June 11, 2019, (Dkt. No. 12), and did not raise it in her complaint, filed November 20, 2018, (Dkt. No. 1).  The rule forbidding new claims at the summary judgment stage is only strictly applied to claims raised in *response* to a summary judgment motion.  *See Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (new claim raised in response to motion for summary judgment); *Ganther v. Ingle*, 75 F.3d 207, 211-12 (5th Cir. 1996) (new claim raised in motion in opposition to summary judgment); *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990); *see also Elliott v. Quintana*, 336 F. App'x 405, 406 (5th Cir. 2009).

Plaintiff is the master of her complaint.  Plaintiff's decision to raise a new claim in her summary judgment motion should be construed as an implicit request to amend the complaint. Plaintiff is outside the time period for amending as a matter of course.  *See* Fed. R. Civ. P. 15(a). Leave of court is required.  *Id.*  Rule 15 directs that courts should "freely" give leave to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Both parties have been able to fully brief the Appointments Clause issue.  The undersigned does not find any cause to withhold leave to amend. Therefore, leave to amend should be **GRANTED**.

### B.      Failure to Raise Appointments Clause Claim at Administrative Level

Plaintiff's argument relies on *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018).  In *Lucia*, the Supreme Court held that Securities and Exchange Commission ("SEC") ALJs are "officers of the United States" and thus subject to the Appointments Clause, meaning that they must be appointed by the President, "Courts of Law," or "Heads of Departments."  138 S. Ct. at 2049-50.  Neither

party disputed that staff members—rather than the President, "Courts of Law," or "Heads of Departments" (i.e. the Commission)—appointed the SEC's ALJs. *Id.* Lucia first raised his Appointments Clause challenge before the SEC Commission, which rejected his claim. *Id.* at 2050. Lucia's appeal to the Court of Appeals for the D.C. Circuit was also rejected. *Id.*

The Supreme Court applied the same analysis as it did in *Freytag v. Commissioner*, 501 U.S. 868 (1991), in which it determined that the special trial judges ("STJ") of the United States Tax Court were inferior officers rather than mere employees by evaluating whether the STJs held "a continuing office established by law" and significance of their discretion in carrying out important functions. *Id.* at 2052-53 ("*Freytag* says everything necessary to decide this case."). The Court found that the SEC ALJs held a continuing office established by law because they receive a career appointment and the position is created by statute. *Id.* at 2053. The Court further found that SEC ALJs "have all the authority needed to ensure fair and orderly adversarial hearings," observing that they have "nearly all the tools of federal trial judges": they take testimony, conduct trials, rule on the admissibility of evidence, and enforce compliance with discovery orders. *Id.* The Court also found that Lucia had made a timely challenge because he "contested the validity of [the SEC ALJ's appointment] before the Commission, and continued pressing that claim in the Court of Appeals and this Court." *Id.* at 2055. The remedy for such a timely-raised constitutional challenge is remand to the agency for a new hearing before a different ALJ. *Id.* Thus, the Court remanded the case to the SEC for a hearing in front of either a properly appointed ALJ or the Commission itself. *Id.*

While the Fifth Circuit Court of Appeals has not yet ruled on the issue, the majority of district courts in this circuit and in our sister circuits have found that an Appointments Clause challenge must be first raised at the administrative level. *See Perkins v. Berryhill*, No. 4:18-CV-

664-A, 2019 WL 2997082, at *4 n.3 (N.D. Tex. June 21, 2019) (collecting cases); *Velasquez v. Berryhill*, No. CV 17-17740, 2018 WL 6920457, at *2 (E.D. La. Dec. 17, 2018), *report and recommendation adopted*, 2019 WL 77248 (E.D. La. Jan. 2, 2019) ("[Courts] have reasoned that a constitutional challenge under the Appointments Clause is *non*jurisdictional, and, thus, a party may forfeit his Appointments Clause claim by failing to raise it at the administrative level.") (emphasis in original).  Some of these courts have found that an applicant must exhaust their administrative remedies by raising the claim before the ALJ, *see Marchant v. Berryhill*, No. 18-0345, 2019 WL 2268982, at *3-4 (E.D. Pa. May 28, 2019) (collecting cases); *Figueroa v. Astrue*, No. CA C-10-393, 2011 WL 3502394, at *4 (S.D. Tex. July 19, 2011) ("Exhaustion requires presentment of each claim to the ALJ."), while others have found that a plaintiff may exhaust administrative remedies by at least raising it before the Appeals Council, *see Marchant*, 2019 WL 2268982, at *3-4 (citing *Kline v. Berryhill*, No. 18-0180, 2019 WL 1782133, at *6 (W.D.N.C. Apr. 23, 2019)).  The Court need not determine whether Plaintiff would have satisfactorily exhausted administrative remedies by raising the claim before the Appeals Council rather than the ALJ, because Plaintiff does not dispute that she failed to raise the Appointments Clause issue at any point in the administrative proceedings.  Rather, Plaintiff argues that the Court should consider the Appointments Clause issue now regardless of her failure to raise it at the administrative stage. (Dkt. No. 13 at 23).  Plaintiff argues that this case is an exception to the rule, one of the "rare cases" as described in *Freytag*.  (*Id.*; Dkt. No. 15 at 8-9).

Defendant argues that the Appointments Clause claim was waived because Plaintiff failed to raise the issue at the administrative stage and, as a non-jurisdictional issue, it is subject to forfeiture.  (Dkt. No. 14 at 8).  Defendant neither concedes nor disputes that the ALJ in this case was unconstitutionally appointed.  Defendant's assertion that an Appointments Clause claim may

be forfeited by failing to raise it is correct.  However, Defendant does not directly address the argument raised by Plaintiff: that this case is, as Plaintiff claims, one of the exceptions to the general rule.  "[C]hallenges under the Appointments Clause are 'nonjurisdictional structural constitutional objections' that are within a court's *discretion* to consider."  *D.R. Horton, Inc. v. N.L.R.B.*, 737 F.3d 344, 351 (5th Cir. 2013) (emphasis added); *see Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 677-79 (6th Cir. 2018) (finding that the applicants did forfeit their Appointments Clause claim but that the forfeiture should be excused); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 756 (D.C. Cir. 2009) (finding that the case was not exceptional and declining to exercise its discretion to deviate from the normal forfeiture rule); *N.L.R.B. v. RELCO Locomotives*, Inc., 734 F.3d 764, 795 (8th Cir. 2013) ("This rule is normally discretionary, and *Freytag* indicates that a reviewing court generally is permitted (though not obliged) to hear a belated appointments clause challenge."); *In re DBC*, 545 F.3d 1373, 1379-80 (Fed. Cir. 2008).

In *Freytag*, the Supreme Court noted that the Appointments Clause issue had not been raised below, but exercised its discretion to consider the matter nonetheless.  501 U.S. at 878-79. The Supreme Court stated that while it is "true that, as a general matter, a litigant must raise all issues and objections at trial," the "alleged defect in the appointment of the Special Trial Judge goes to the validity of the . . . proceeding that is the basis for this litigation."  *Id*.  The Supreme Court suggested that the Appointments Clause issue, although a "nonjurisdictional structural constitutional" issue, fell into a category of claims that the Court has frequently treated as quasi-jurisdictional.  *Id*.  Thus, the Court addressed the Appointments Clause claim.  In doing so, the Court tapped into a line of reasoning related to "exceptional cases" in which reviewing courts can exercise their discretion to consider an issue in spite of the fact that the issue was not raised below.

In *Hormel*, one of the cases relied upon in *Freytag*, the Court wrote that "[t]here may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below." *Hormel v. Helvering*, 312 U.S. 552, 557 (1941). "Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice." *Id.*

The Supreme Court has emphasized that the concern that justice might be sacrificed to rigid judicial procedure is heighted when the passed-upon issue is one that deeply affects the "administration of justice." For example, the Court has stated that the question of whether a trial judge was prohibited from "sitting in an appeal which was not from his own order, but from an order setting aside his order, is a novel and important one, deeply affecting the administration of justice in the circuit court of appeals. If the statute made him incompetent to sit at the hearing, the decree in which he took part was unlawful, and perhaps absolutely void, and should certainly be set aside or quashed by any court having authority to review it by appeal, error, or certiorari." *Am. Const. Co. v. Jacksonville, T. & K.W. Ry. Co.*, 148 U.S. 372, 387 (1893). In *Glidden Co. v. Zdanok*, the Supreme Court expressly found that an Appointments Clause issue regarding the authority of lower-court judges affected the "proper administration of judicial business" and should be treated as quasi-jurisdictional. *Glidden Co. v. Zdanok*, 370 U.S. 530, 535-36 (1962). The Court held that "when the statute claimed to restrict authority is not merely technical but embodies a strong policy concerning the proper administration of judicial business, this Court has treated the alleged defect

as 'jurisdictional' and agreed to consider it on direct review even though not raised at the earliest practicable opportunity." *Id.* "The alleged defect of authority here relates to basic constitutional protections designed in part for the benefit of litigants. It should be examinable at least on direct review, where its consideration encounters none of the objections associated with the principle of res judicata, that there be an end to litigation." *Id.*

The Fifth Circuit has utilized or acknowledged the "exceptional case" line of reasoning in its own opinions, holding that "[t]he general rule of appellate review from decisions of an administrative agency is 'that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.' . . . But the rule is not inflexible." *Bd. of Pub. Instruction of Taylor Cty., Florida v. Finch*, 414 F.2d 1068, 1072 (5th Cir. 1969); *Crawford v. Falcon Drilling Co.*, 131 F.3d 1120, 1123 (5th Cir. 1997) (it is "well established" that "an exception to the general rule allows our Court to review an issue of law raised for the first time on appeal in exceptional circumstances"); *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1057 n.8 (5th Cir. 1985) ("The utility of this practice [of addressing an issue that the parties failed to raise below] is manifest where, as in this case, a party's failure to argue a point would otherwise deprive the court of a potentially dispositive decisional tack."); *Myron v. Martin*, 670 F.2d 49, 52 (5th Cir. 1982) ("In exceptional circumstances a court will review for the first time on appeal a particular challenge to an agency's decision which was not raised during the agency proceedings."). In *Board v. Finch*, the Fifth Circuit found that the Supreme Court has indicated reluctance to "abandon the now familiar principle that 'Rules of practice and procedure are devised to promote the ends of justice, not to defeat them.' " *Id.*

In *Lucia*, the Supreme Court emphasized the continuity of Lucia's objections: "Lucia made just such a timely challenge: He contested the validity of [the ALJ's] appointment before the Commission, and continued pressing that claim in the Court of Appeals and this Court." *Lucia*, 138 S. Ct. at 2055. The majority of district courts have found that the Appointments Clause issue, as raised in the SSA context, was waived if not presented at the administrative level. In doing so, the courts have relied heavily on the language in *Lucia* "requiring 'a timely challenge.' " *See, e.g., Velasquez v. Berryhill*, No. CV 17-17740, 2018 WL 6920457, at *3 (E.D. La. Dec. 17, 2018), *report and recommendation adopted*, 2019 WL 77248 (E.D. La. Jan. 2, 2019) ("I am persuaded by the majority of courts' interpretation of the clear Supreme Court's language of *Lucia* itself."); *Pearson v. Berryhill*, No. 17-4031-SAC, 2018 WL 6436092, at *4 (D. Kan. Dec. 7, 2018) ("The key in deciding this issue is in the language of the *Lucia* decision."). The Defendant underscores this language, arguing that only a party who makes a timely challenge is entitled to relief. (Dkt. No. 14 at 14).

While the Supreme Court emphasized in *Lucia* that the claimant had timely raised his Appointments Clause challenge, in doing so the Supreme Court may have been doing nothing more than noting that the waiver issue raised in *Freytag* was not at play. Nothing in *Lucia* supports that the Supreme Court intended to remove federal courts' discretion to consider nonjurisdictional constitutional objections.[3] As such, the undersigned does not read *Lucia*'s discussion of timeliness to be entirely dispositive with respect to the instant case.[4] A court should proceed on a "case-by-

---

[3] Plaintiff should have raised her claim at the administrative level. She does not contest this. However, reviewing courts must be able to sometimes exercise their discretion to address important legal issues in the case. Sometimes the parties themselves fail to discern a material and dispositive legal issue early on. A claimant's error in failing to raise such an issue cannot bar the courts from discussing it if needed.

[4] As explained by one district court:

> We believe, as do a growing number of courts, that this emphasis on *Lucia*'s timeliness language is misplaced and should not lead to a summary rejection of Appointments Clause

case basis" in determining "whether the circumstances of the particular case warrant excusing the failure to timely object." *In re DBC*, 545 F.3d 1373, 1380 (Fed. Cir. 2008).

The undersigned finds that this case better fits the general rule than the exception. While the Supreme Court in *Freytag* found that the nonfrivolous Appointments Clause issue therein met the exception, this case does not strike the same balance. It would be a waste of both federal and SSA resources to permit this claim to be raised now. Other courts have used their discretion to decline Appointments Clause challenges, finding that the post-*Lucia* Appointments Clause challenges brought before them fall short of the "rare" case warranting excusal of forfeiture.[5] *Muhammad v. Berryhill*, 381 F. Supp. 3d 462, 469 (E.D. Pa. 2019) ("Nothing about Muhammad's case warrants excusing his failure to timely raise the Appointments Clause challenge before the ALJ and throughout the administrative process. While Muhammad's challenge is neither 'frivolous nor disingenuous,' there is nothing rare about his case."); *Page v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 902, 904 (E.D. Mich. 2018) ("The facts of this case do not warrant making an exception to the general rule that the failure to bring as-applied claims at the administrative level results in waiver."); *Christy A. L. v. Saul*, No. 2:18-CV-00260-JDL, 2019 WL 2524776, at *3 n.3 (D. Me. June 19, 2019), *report and recommendation adopted*, 2019 WL 3459227 (D. Me. July 30,

---

challenges not raised at the ALJ administrative level. We observe that there was neither a timeliness nor exhaustion question raised as to *Lucia*'s constitutional challenge given that he raised it before the SEC's appellate body and in federal court. . . . As the court noted in *Bizarre*, '[t]he [*Lucia*] majority's statement as to timeliness was not a bright-line demarcation . . . it simply confirmed the obvious timeliness of the fully preserved and exhausted claim as presented.'

*Brunson v. Saul*, No. CV 18-5562, 2019 WL 3413520, at *2 (E.D. Pa. July 26, 2019) (citing *Bizarre v. Berryhill*, 364 F. Supp. 3d 418, 420-21 (M.D. Pa. March 4, 2019)); *see also Associated Mortgage Bankers, Inc. v. Carson*, 2019 WL 108882, at *5 (D.D.C. Jan. 4, 2019) ("*Lucia* did not define the scope of what constitutes a timely challenge, as there was no claim in *Lucia* that the challenge . . . was not timely raised.").

[5] *See Bizarre v. Berryhill*, 364 F. Supp. 3d 418, 425 (M.D. Pa. 2019) (agreeing that *Freytag* did not "open the door for every untimely Appointments Clause challenge" but deciding that the case before it was "one of those rare cases").

2019) ("[T]his case does not qualify as rare."); *Squier v. Saul*, No. 18-CV-3026-LTS, 2019 WL 4696415, at *10 (N.D. Iowa Sept. 26, 2019) ("I do not accept that this is one of those 'rare cases' when review of an Appointments Clause challenge is appropriate under *Freytag*."); *Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *16 (N.D. Iowa Oct. 10, 2019) (same); *Bennett v. Berryhill*, No. 2:17-CV-520, 2019 WL 1104186, at *10 (E.D. Va. Feb. 15, 2019), *report and recommendation adopted*, 2019 WL 1102203 (E.D. Va. Mar. 8, 2019) ("In fact, Plaintiff['s case] is just one in a flood of cases now challenging the appointment of ALJs in the wake of *Lucia*.").

The primary purpose for "requiring that a party make an objection to the agency is that it promotes judicial efficiency, as '[c]laims generally can be resolved much more quickly and economically in proceedings before [the] agency than in litigation in federal court." *DBC*, 545 F.3d at 1379; *Myron v. Martin*, 670 F.2d 49, 51 (5th Cir. 1982) ("Practical notions of judicial efficiency, administrative autonomy and encouraging effective agency procedures provide the basis for the general rule."). Indeed, at this moment, the purpose of the general forfeiture rule could not be more clear: substantively addressing the Appointments Clause issue as a summary judgment issue is not possible.[6] The SSA does not have a current regulation or rule[7] that governs how it appoints ALJs. The applicable federal statute reads that "[e]ach agency shall appoint as many administrative law judges as are necessary for proceedings required to be conducted . . . ."

---

[6] Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

[7] Prior to 2017, social security regulations stated that, for the purposes of a hearing before an ALJ, "[t]he Commissioner will appoint an administrative law judge to conduct the hearing." 20 C.F.R. § 405.301 (2016). Additionally, an ALJ was defined as "an administrative law judge appointed pursuant to the provisions of 5 U.S.C. 3105 who is employed by the Social Security Administration." 20 C.F.R. § 405.5 (2016). Effective January 17, 2017, however, the SSA removed and reserved Section 405. *See* Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90,987 (Jan. 17, 2017) ("Under the authority of sections 205(a), 702(a)(5), and 1631(d)(1) of the Social Security Act, part 405 is removed and reserved.").

5 U.S.C. § 3105.[8]   An Appointments Clause challenge to the appointment of Judge Osly F. Deramus is an "as applied" challenge, rather than "facial" challenge to a statute or regulation. *See Davidson v. Comm'r of Soc. Sec.*, No. 2:16-CV-00102, 2018 WL 4680327, at *2 (M.D. Tenn. Sept. 28, 2018); *Faulkner v. Comm'r of Soc. Sec.*, No. 117CV01197STAEGB, 2018 WL 6059403, at *3 (W.D. Tenn. Nov. 19, 2018); *Berry v. Saul*, No. 1:18-CV-00046, 2019 WL 4923979, at *13 (M.D. Tenn. Aug. 20, 2019), *report and recommendation adopted*, 2019 WL 4916566 (M.D. Tenn. Oct. 4, 2019). In other words, the statutory language *can* be applied in a constitutional manner. The issue is how the agency appointed their ALJs in practice.

Plaintiff has submitted no evidence or support showing how or when Judge Deramus was appointed. Had Plaintiff raised this issue at the administrative level, the agency would have had the opportunity to fix the alleged problem—at the very least, the record could have been developed.[9] In the cases Plaintiff relies on, the Commissioner *conceded* that the ALJs were inferior officers and should have been, but were not, appointed in accordance with the Appointments Clause.[10] *See Wilson v. Berryhill*, 379 F. Supp. 3d 381, 384 (E.D. Pa. 2019) ("The Commissioner

---

[8] Other relevant statutes include 42 U.S.C. § 902(a)(7) ("The Commissioner may assign duties, and delegate, or authorize successive redelegations of, authority to act and to render decisions, to such officers and employees of the Administration as the Commissioner may find necessary. Within the limitations of such delegations, redelegations, or assignments, all official acts and decisions of such officers and employees shall have the same force and effect as though performed or rendered by the Commissioner.") and 42 U.S.C. § 904 ("The Commissioner shall appoint such additional officers and employees as the Commissioner considers necessary to carry out the functions of the Administration under this chapter, and attorneys and experts may be appointed without regard to the civil service laws.").

[9] "[T]he requirement that a party object to an agency prior to attacking that agency's action in court serves two primary purposes" the first of which is to allow the agency "an opportunity to correct its own mistakes . . . before it is [hauled] into federal court . . . ." *In re DBC*, 545 F.3d 1373, 1378 (Fed. Cir. 2008).

[10] The exceptions are *Mann v. Berryhill*, in which the Commissioner neither disputed nor conceded that the ALJs are inferior officers, but the issue was moot because the court found that the ALJ's decision was not supported by substantial evidence and that the case must be remanded anyway, *see Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL 6421725, at *8-9 (D. Neb. Dec. 6, 2018), and *Ready v. Berryhill*, in which the magistrate judge simply stated that the "ALJ was improperly appointed under the Constitution" without explanation, *see Ready v. Berryhill*, No. CV 18-04289, 2019 WL 1934874, at *1 (E.D. Pa. Apr. 30, 2019).

concedes that SSA ALJs are inferior officers who must be appointed pursuant to the Appointments Clause."); *Culclasure v. Comm'r of Soc. Sec. Admin.*, 375 F. Supp. 3d 559, 560 (E.D. Pa. 2019) ("[T]he Commissioner concedes the constitutional infirmity but argues Mr. Culclasure forfeited his challenge . . . ."); *Bradshaw v. Berryhill*, 372 F. Supp. 3d 349, 363 (E.D.N.C. 2019) ("[T]he SSA does not dispute Bradshaw's contention that SSA ALJs are inferior officers."); *Probst v. Berryhill*, 377 F. Supp. 3d 578, 583 (E.D.N.C. 2019) ("The Commissioner does not dispute [that the ALJ was subject to the Appointments Clause] for purposes of this appeal."); *Bizarre v. Berryhill*, 364 F. Supp. 3d 418, 420 (M.D. Pa. 2019) ("The Commissioner does not dispute that the Social Security Administration's ALJs are inferior officers for purposes of this appeal or that the ALJ in this case was not appointed in accordance with the Appointments Clause.").

Here, by contrast, the Defendant is silent on the alleged constitutional infirmity in Judge Deramus' appointment. The Defendant argues only the forfeiture issue. The Court cannot simply assume that Judge Dermaus was, in fact, unconstitutionally appointed without the Defendant conceding the constitutional infirmity or development of the record. It is unknown if Plaintiff's Appointments Clause challenge is nonfrivolous.

Plaintiff argues that the Commissioner effectively acknowledged that the ALJs are inferior officers who were not constitutionally appointed because the Commissioner ratified all appointments as her own. (*See* Dkt. No. 13 at 20). Although some courts have taken the ratification to be an admission[11], the undersigned does not read more meaning into the ratification than is apparent. It is equally fair to view the Commissioner's ratification as a prophylactic

---

[11] *See Culclasure v. Comm'r of Soc. Sec. Admin.*, 375 F. Supp. 3d 559, 563 (E.D. Pa. 2019) (finding that the Emergency Message was confirmation that the SSA did not constitutionally appoint ALJs); *see also Walsh v. Saul*, No. 3:18-CV-673, 2019 WL 3816941, at *2 (M.D. Pa. Aug. 14, 2019) ("Evidently, the ALJ had not been properly appointed. The Acting Commissioner ratified the appointment of the ALJs on July 16, 2018, well after the plaintiff's hearing and decision.").

measure to deter any future Appointments Clause challenges, and not as an admission that SSA ALJs were unconstitutionally appointed. Neither the emergency message nor policy interpretation ruling issued in response to *Lucia* concede that the ALJS were unconstitutionally appointed. The emergency message states that the Acting Commissioner ratified the appointment of ALJs and AAJs "in order to address any Appointments Clause questions involving SSA claims." *See* Emergency Message, EM-18003 REV 2 (Aug. 6, 2018), available at https://secure.ssa.gov /apps10/reference.nsf/links/08062018021025PM. The policy interpretation notes that it is uncertain if *Lucia* applies to ALJs in other agencies outside the SEC, because *Lucia* "did not specifically address the constitutional status of ALJs who work in other Federal agencies, including the Social Security Administration (SSA)." SSR 19-1p, 84 Fed. Reg. 9582 (Mar. 15, 2019). The undersigned does not interpret the Commissioner's ratification to be an admission that the SSA ALJs were previously unconstitutionally appointed or that they are inferior officers within the meaning of the Appointments Clause. *See Gothard v. Comm'r of Soc. Sec.*, No. 1:17-CV-13638, 2018 WL 7254254, at *14 (E.D. Mich. Oct. 10, 2018), *report and recommendation adopted*, 2019 WL 396785 (E.D. Mich. Jan. 31, 2019) ("From this [emergency message] alone . . . it is not at all apparent that the ALJ here was improperly appointed. Contrary to Plaintiff's assertion, the Message does not acknowledge that Social Security ALJs had been unconstitutionally appointed before the ratification—it neither mentions the prior appointment system nor accepts that *Lucia* applies.")[12]; *Shoops v. Comm'r of Soc. Sec.*, No. 18-CV-10444, 2019

---

[12] In adopting the Report and Recommendation, the District Court stated that "[f]or the same reasons explained by Judge Morris, the mere fact that the commissioner ratified the ALJ's appointments in response to *Lucia* does not constitute an admission that the appointments prior to the ratification were unconstitutional or that *Lucia*'s decision regarding SEC ALJ's is applicable to SSA ALJ's. Rather, the Commissioner simply took steps to head off future appointments clause challenges, irrespective of whether those future challenges would be meritorious." *Gothard v. Comm'r of Soc. Sec.*, No. 1:17-CV-13638, 2019 WL 396785, at *3 (E.D. Mich. Jan. 31, 2019).

WL 2051902, at *12 (E.D. Mich. Feb. 14, 2019), *report and recommendation adopted as modified*, No. 18-10444, 2019 WL 1417164 (E.D. Mich. Mar. 29, 2019).

Again, Plaintiff does not find herself in the desirable position of facing opposing counsel who concedes that the presiding ALJ was unconstitutionally appointed. After raising her Appointments Clause claim at this late hour, Plaintiff does not provide the court with the "necessary tools to resolve it."[13] The judicial inefficiency that would result in attempting to resolve this claim now is both emblematic of the concerns underlying the general forfeiture rule and militates in favor of declining to review it.

Additionally, there is not good cause for failing to raise the issue at the administrative level. The ALJ's decision was issued on February 13, 2018, and *Lucia* was decided on June 21, 2018. However, the fact that Plaintiff had new case law support for an Appointments Clause claim because of *Lucia* does not mean the claim was novel prior to *Lucia* or untenable without the *Lucia* decision. Every case to make its way to the Supreme Court began at the lowest levels of the administrative or judicial system. The feasibility of raising an Appointments Clause claim at the administrative level is proven by the fact that the claimant in *Lucia* raised his claim at the lowest level and continued to press his claim through to the Supreme Court. *Lucia* provides important support for an Appointments Clause claim; claimants should not misinterpret this fact to mean Appointments Clause claims could not have been raised before *Lucia*. Plaintiff, for example, could have raised the claim before the ALJ based on *Freytag*, decided in 1991. *See Dyslin v. Comm'r of Soc. Sec.*, No. 18-CV-0014-LTS, 2019 WL 2219004, at *14 (N.D. Iowa Feb. 22, 2019), *report and recommendation adopted*, No. C18-14-LTS, 2019 WL 1331742 (N.D. Iowa Mar. 25, 2019)

---

[13] *Gothard v. Comm'r of Soc. Sec.*, No. 1:17-CV-13638, 2018 WL 7254254, at *15 (E.D. Mich. Oct. 10, 2018), *report and recommendation adopted*, 2019 WL 396785 (E.D. Mich. Jan. 31, 2019).

(reasoning that claimant could have raised argument based on *Freytag*); *Hodges v. Comm'r of Soc. Sec.*, No. 1:18-CV-394, 2019 WL 1330847, at *4 (S.D. Ohio Mar. 25, 2019) (rejecting argument that claimant could not have raised claim before the ALJ). Furthermore, the Supreme Court granted certiorari in the *Lucia* case on January 12, 2018. *Lucia v. S.E.C.*, 138 S. Ct. 736 (2018). This means that Plaintiff could have presented her claim to the Appeals Council *and* noticed them of the upcoming decision in *Lucia*. Because *Lucia* was decided during the time that Plaintiff's case was under review by the Appeals Council, Plaintiff could have obtained instant relief at the administrative level.[14]

In *Board v. Finch*, the Fifth Circuit found that the case before it was an exception to the general forfeiture rule because (1) the case dealt with the action of an administrative agency that was "in excess of statutory authority," (2) "likely to result in individual injustice," (3) "disruptive of the legislative scheme," and (4) "contrary to an important public policy extending beyond the rights of the individual litigants." *Finch*, 414 F.2d at 1073. *Board v. Finch* was exceptional because the case touched upon withdrawn federal funding for multiple federal education programs in the Taylor County School District. *Id.* at 1070-72. The central issue was whether the Department of Health, Education, and Welfare exceeded its statutory authority in terminating all federal funds to the school district, without discriminating between the various federal education programs. *Id.*

---

[14] Another line of argument raised by plaintiffs in post-*Lucia* cases is that raising the claim would have been futile because the ALJs themselves could not have ruled on a constitutional law issue. The undersigned does not find this reasoning persuasive. As addressed in *Muhammad*, "the issue is not whether the ALJ could resolve or decide an issue of constitutional law, but instead whether the SSA, alerted to the problem by [claimant]'s timely objection, could have corrected any error in the ALJ's appointment or assigned a different ALJ to preside over [claimaint]'s hearing." *Muhammad v. Berryhill*, 381 F. Supp. 3d 462, 471 (E.D. Pa. 2019); *see also In re DBC*, 545 F.3d at 1379 ("If DBC had timely raised this issue . . . the Board could have evaluated and corrected the alleged constitutional infirmity . . . . Of course, the Board may not have corrected the problem, or even acknowledged that the problem existed. But in that case, DBC would have preserved its right to appeal the issue.").

After considering the factors outlined in *Finch*, the undersigned finds that they are inapplicable to the instant case. This case does not address an agency action that was in excess of statutory authority or implicate the overall legislative scheme. Furthermore, even if the appointment process for the ALJ was flawed, the impact of this case does not extend beyond the individual claimant, and the undersigned does not find that declining to review this claim would result in individual injustice. That is, if the ALJ's decision was not actually defective, no injustice has been suffered. Without the concern that Plaintiff might have suffered some genuine harm or prejudice from having her case heard before Judge Deramus, as opposed to another ALJ, the argument that technical judicial procedure should cave to the interests of justice loses its force. This concern was noted in *L.A. Tucker Truck Lines*: "The apparent reason for complacency [in raising the claim] was that [appellee] was not actually prejudiced by the conduct or manner of appointment of the examiner. . . . The issue is clearly an afterthought, brought forward at the last possible moment to undo the administrative proceedings without consideration of the merits and can prevail only from technical compulsion irrespective of considerations of practical justice." *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 35 (1952) (finding that any irregularity in the hearing examiner's appointment should be set aside as a nullity). Plaintiff seeks remand, however, remanding the case before another ALJ would not necessarily provide Plaintiff with the DIB or SSI benefits she seeks. *See In re DBC*, 545 F.3d 1373, 1381 (Fed. Cir. 2008) ("The fact that we have affirmed the merits of the Board's action in this case also speaks against our exercising discretion and needlessly protracting . . . reexamination of the [case].").

For similar reasons, multiple courts have also found that curative agency action mitigates the need to make an exception to the rule. "[E]xceptional circumstances do not exist where there remains the possibility that the Court could remand the case to an ALJ whose appointment has

since been ratified by the Acting Commissioner of Social Security and whose appointment has been approved as the Acting Commissioner's own." *Marilyn R. v. Comm'r of Soc. Sec.*, No. 418CV04098SLDJEH, 2019 WL 4891703, at *7 (C.D. Ill. July 18, 2019), *report and recommendation adopted*, 2019 WL 4389052 (C.D. Ill. Sept. 13, 2019)); *Diane S. P. v. Berryhill*, 379 F. Supp. 3d 498, 525 (E.D. Va. 2019) (finding that the exhaustion rule should be enforced in part because the SSA took action to cure any alleged deficiency in the appointment of its ALJs).

Sometimes the interests of justice and the proper administration of judicial business warrant making an exception to rigid judicial procedure; in this case, those interests are aligned with judicial procedure. The undersigned finds that the District Court should decline to exercise its discretion to consider the merits of the Appointments Clause issue.

## III.  DISABILITY DETERMINATION

### A.     Standard of Review

Judicial review of the Commissioner's decision is limited to two inquiries: "whether (1) the [final] decision is supported by substantial evidence and (2) [that] proper legal standards were used to evaluate the evidence." *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999) (internal quotation marks omitted). "In a disability case, '[t]he function of a reviewing court is to determine whether the . . . [agency's] findings are supported by substantial evidence in the record as a whole and to determine the reasonableness of the decision reached.'" *Salgado v. Astrue*, 271 F. App'x 456, 459 (5th Cir. 2008) (*quoting Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir. 1981)).

The court must affirm the ALJ's decision if it is supported by substantial evidence. *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence is "more than a mere scintilla, and less than a preponderance."

*Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (internal quotation marks omitted) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "A decision is supported by substantial evidence if credible evidentiary choices or medical findings support the decision." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018). "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000) (internal quotations omitted).

The Court must examine the record in its entirety. *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979). The Court must examine the record for substantial evidence while considering the following factors: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history. *Perez v. Barnhart*, 415 F.3d 457, 462 (5th Cir. 2005). The inquiry is necessarily highly deferential to the Commissioner. The court may not "reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [its] judgment for that of the [Commissioner], even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Brown*, 192 F.3d at 496 (internal citations omitted).

"Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected." *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (quoting *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)); *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001) ("This Court requires . . . a showing that the claimant was prejudiced

by the agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision.") (citation omitted).

### B.      Relevant Facts and Relevant Medical Record Evidence

Medical documentation unrelated to Plaintiff's mental impairments, i.e. documentation related to any physical infirmities, will be omitted.

#### 1.      Claimant's Age, Education, and Work History

Plaintiff was born on July 3, 1985, and was 32 years old at the time of the ALJ's decision. (Dkt. No. 8-3 at 25).  Plaintiff has an eleventh-grade education.  (*Id*. at 38).  Although Plaintiff worked as a beautician in 2007 and 2014, Plaintiff was not certified as a beautician.  (*Id*. at 38, 73-75).

#### 2.      Claimant's Subjective Evidence of Disability

A lengthy, undated letter written by Plaintiff was included in the record.  In it, she describes her history of physical and emotional abuse.  (Dkt. No. 8-7 at 58-77).  She states that her mother would physically beat her with a pipe.  (*Id*. at 61-64).  At age 13, she suffered an epileptic seizure. (*Id*.).  Plaintiff's mother believed she was on drugs and responded by beating her.  (*Id*.).  Plaintiff's epileptic seizure went untreated.  (*Id*.).  Plaintiff states that a few weeks after her first seizure, she suffered another seizure, this time in front of her cousin.  (*Id*. at 65-66).  Plaintiff states that at that time she was brought to the hospital and was diagnosed with epilepsy.  (*Id*.).

Plaintiff also completed two function reports.  In one, Plaintiff explained that she cannot go out alone because she will "get confuse[d], without concentrating of what I am doing or what I was going [to] do" and that, similarly, she does not drive because "I get dizzy, confuse[d] on the road.  The other cars confuse me, [and] it causes me to forget what I am doing or going [to] do." (Dkt. No. 8-7 at 35).  Plaintiff also reported that she gets along with authority figures "very good,

I am a polite person." (*Id.* at 38).  In terms of "unusual behavior or fears" Plaintiff wrote that "I try to say something I am thinking and those word[s] come out wrong [and] I try to fix what I am saying [and] still get all my words confused." (*Id.*).  This report is dated "07-03-85" (the day of her birth). (*Id.* at 39).

In her second function report, Plaintiff explained that she cannot go out alone because "I don't like to [do] it[,] [it] makes me nervous for a man to stare at me." (Dkt. No. 8-7 at 52).  She also reported in terms of "unusual behavior or fears" that when in public, "it seem[s] like someone can look or come up to me with bad intentions." (*Id.* at 55).  She stated she gets along with authority figures "well." (*Id.*).  She stated she does not drive because she "always feel[s] disoriented [and] dizzy." (*Id.* at 52).  This report is dated July 26, 2016. (*Id.* at 56).

At the hearing before the ALJ, Plaintiff testified that she cannot "think straight," that her moods alternate between better and worse, and that she does not feel comfortable being outside surrounded by people.  (Dkt. No. 8-3 at 52-53).  She testified that she "cannot be around men" because she feels they have bad intentions. (*Id.* at 54).  She stated she would be uncomfortable around one man, if she did not know him, such that she could not look him in the eyes. (*Id.*).  Plaintiff testified that she would not be uncomfortable around five unknown females. (*Id.*).

Regarding her mood fluctuations, Plaintiff testified that she does not become angry, but that she will become scared and may have an anxiety attack. (*Id.* at 55).  Plaintiff testified that she has anxiety attacks one to three times a week, or roughly fifteen times a month. (*Id.* at 55-59).  Plaintiff testified that her anxiety attacks might take 30 minutes to pass, although they can be longer. (*Id.*).  Plaintiff further testified that she does not attend her son's sports games because there are a lot of men attending the games, and that she does not attend church because "everybody

is staring" and it makes her uncomfortable.  (*Id.* at 63-64).  Plaintiff could go out in public to go shopping, however, with her husband.  (*Id.* at 64).

Plaintiff testified that her "confusing-ness" and the fact that her mind wanders off frequently is what prevents her from working even at a physically undemanding job.  (*Id.* at 70-71).  She stated that she "can be trying to talk with someone, and all of a sudden, you know, you're talking to me, and I start drifting away."  (*Id.*).[15]

### 3.  *Medical Records*

#### a.  Border Region Behavioral Health Center

Plaintiff was most consistently examined and treated at the Border Region Behavioral Health Center ("BRBHC").  The earliest medical documentation from BRBHC in the record is an intake assessment completed by Francisca Ramon, dated December 6, 2016, which notes that Plaintiff had received previous psychiatric treatment at BRBHC when she was younger, but that her mother did not follow through with services.  (Dkt. No. 8-10 at 3).  Under treatment recommendations, the report states that "medications will help decrease symptoms." (*Id.* at 14).

On January 4, 2017, Dr. Blanca Diez gave Plaintiff a mental status exam.  (Dkt. No. 8-10 at 40-47).  Dr. Diez found that Plaintiff's mood was angry, irritable, dysphoric, anxious, and depressed.  (*Id.* at 41).  Her thought process was logical, but she suffered from auditory hallucinations and paranoid/persecutory delusions.  (*Id.*).  Dr. Diez wrote that Plaintiff would hear the voice of her mother screaming at her, and that Plaintiff feels paranoid and uncomfortable around other people because she feels they want to hurt her.  (*Id.*).  Dr. Diez found that Plaintiff had partial insight and good judgment.  (*Id.*).  Dr. Diez prescribed Plaintiff psychotropic

---

[15] The undersigned notes that Plaintiff filed her claim for disability based on select impairments; the mental disorders Plaintiff claimed she suffered from were "depression and anxiety," not a neurocognitive or neurodevelopmental disorder. (Dkt. No. 8-4 at 2-3).

mediations, including Cymbalta and Seroquel, and also recommended therapy to work on her dysfunctional relationship with her mother. (*Id.* at 42, 45-46).

Dr. Diez gave Plaintiff another mental status exam on February 1, 2017. (Dkt. No. 8-10 at 31). Plaintiff's mood was "euthymic." (*Id.* at 32). Her thought process was logical. (*Id.*). Plaintiff still had auditory hallucinations and paranoid/persecutory delusions. (*Id.*). Plaintiff's attention, concentration, short-term memory, and long-term memory were adequate and/or intact. (*Id.* at 33). Plaintiff's exhibited "partial" insight and her judgment was good. (*Id.*). Dr. Diez wrote that Plaintiff had a "very positive response to medications." (*Id.* at 33). Plaintiff reported to the doctor that she was able to sleep and garden, that she did not have side effects, that she was able to relax, and that she was not tense. (*Id.* at 35).

On March 9, 2017, Dr. Diez wrote that Plaintiff has recurrent episodes of dissociation, during which she experiences flash backs to periods of abuse during her childhood. (*Id.* at 23). She also experiences paranoia due to her past sexual abuse. (*Id.*). Dr. Diez increased Plaintiff's dose of Cymbalta and prescribed Vistaril for Plaintiff's anxiety and panic attacks. (*Id.* at 29). Dr. Diez also recommended therapy to work on Plaintiff's painful memories. (*Id.*).

A report dated April 8, 2017, from BRBHC diagnosed Plaintiff with Bipolar II disorder and Post-Traumatic Stress Disorder. (*Id.* at 7). The report notes that Plaintiff's last seizure was in 2002. (*Id.*). The report notes that Plaintiff experienced anxiety when a neighbor attempted to engage in friendly conversation. (*Id.*). The prescribed psychotropic medications either were not working or had no noted effect. (*Id.*). Counseling was recommended to help with her anxiety. (*Id.*). The report was completed by Jackie Tanya Rosado, LPC. (*Id.* at 8).

A physician's progress note, completed by Dr. Diez on July 19, 2017, stated that Plaintiff was diagnosed with Bipolar II disorder, depression, and PTSD. (*Id.* at 15). Plaintiff was examined

on this date. (*Id.*). Dr. Diez found Plaintiff's attitude to be engaged, friendly, cooperative, and responsive. (*Id.* at 16). Plaintiff's mood was irritable, dysphoric, anxious, and depressed. (*Id.*). Dr. Diez also found Plaintiff's thought process to be relevant, logical, and spontaneous. (*Id.* at 17). Plaintiff, however, still suffered from derealization episodes and paranoid/persecutory delusions. (*Id.* at 15, 17). Plaintiff's attention, concentration, short-term memory, and long-term memory were adequate and/or intact. (*Id.* at 18). Under insight and judgment, Dr. Diez marked "none." (*Id.*). Dr. Diez increased Plaintiff's dose of Cymbalta, Seroquel, and prescribed Gabapentin for anxiety. (*Id.* at 20). Dr. Diez took Plaintiff off Vistaril because it was not helping. (*Id.*). Therapy or counseling was recommended. (*Id.* at 21).

On October 11, 2017, Plaintiff again saw Dr. Diez and reported that she felt bad, was stressed, and had been without her medications for over a month. (Dkt. No. 8-10 at 56, 61). Plaintiff reported that she had intermittent thoughts about wanting to die, but would not hurt herself because of her children. (*Id.* at 56). Plaintiff stated that she had too much anxiety and was depressed. (*Id.*). Plaintiff described that she had to make an effort to take care of herself, and that she would go take a shower and start crying. (*Id.*). Dr. Diez found that the Cymbalta and Seroquel were not helping and took Plaintiff off those medications. (*Id.* at 61). Dr. Diez prescribed Tegretol for mood stabilization and Wellbutrin for depression. (*Id.* at 61-62). Therapy or counseling was recommended. (*Id.* at 63).

The last documented visit to Dr. Diez was on November 8, 2017. (Dkt. No. 8-10 at 70). Plaintiff reported that the medications for anxiety and sleep were helping, but the depression medication was not strong enough. (*Id.*). Plaintiff was able to sleep better and relax, but still felt depressed. (*Id.*). She did not have suicidal thoughts. (*Id.*). She did not experience auditory hallucinations or paranoid thoughts. (*Id.*). Her mood was dysphoric and anxious. (*Id.* at 71). Her

thought process was logical, relevant, and spontaneous. (*Id.* at 72). She exhibited partial insight and good judgment. (*Id.*). Dr. Diez increased the dosage of Wellbutrin. (*Id.* at 77). Therapy or counseling was recommended. (*Id.*).

b.    Examination by Dr. Monica Hernandez

Plaintiff was scheduled to visit Dr. Monica Hernandez twice for a mental status exam on April 20, 2016 and April 29, 2016, respectively, but Plaintiff did not appear. (Dkt. No. 8-9 at 88-91).

c.    Examination by Dr. Mary Elizabeth De Ferreire

On May 23, 2016, Plaintiff was examined by Dr. Mary Elizabeth De Ferreire regarding her mental status. (Dkt. No. 8-9 at 92). Plaintiff reported that, as of that date, she was seeing a physician from Mexico who prescribed her medication for anxiety, and that she was responding well to the medication. (*Id.* at 93). Plaintiff self-reported that she is unable to work because she is unable to concentrate. (*Id.*). Plaintiff also reported that she does not have a need for supervision, that she can care for her personal hygiene, that she does not cook, does not handle finances, and does not shop for groceries. (*Id.*). Plaintiff stated that she does relate to others and does have friends, but she does not attend church or visit relatives. (*Id.*). She gets along with her family members and gets along with people of authority. (*Id.*). Plaintiff reported a history of seizures. (*Id.* at 95).

Dr. De Ferreire examined Plaintiff and found that Plaintiff exhibited a neutral attitude and neutral behavior, and there was no appearance of invalidism. (*Id.* at 96). Plaintiff's thought process was coherent, logical, and goal directed. (*Id.*). She demonstrated abstract thinking, but she did not demonstrate persistence. (*Id.*). Plaintiff denied having current or past delusions or phobias. (*Id.* at 97). Plaintiff described past suicidal thoughts and moderate feelings of depression.

(*Id.*).  Plaintiff denied feelings of anger and denied feelings of anxiety.  (*Id.*).  Plaintiff appeared alert and oriented, except she was not oriented as to the day and date.  (*Id.*).  Dr. De Ferreire opined that Plaintiff's cognitive skills fell at the "[B]orderline range of intellectual functioning."  (*Id.*).  Dr. De Ferreire tested Plaintiff's memory by giving her sets of words or numbers to recall and having her recall the names of U.S. Presidents.  (*Id.* at 97-98).  Dr. De Ferreire determined that Plaintiff's immediate memory skills were impaired, but her short-term memory skills were intact, her long-term memory skills were intact, and her remote memory skills were intact.  (*Id.*).  Plaintiff's judgment skills were intact.  (*Id.*).  Dr. De Ferreire opined that Plaintiff's insight was impaired "due to self-definition as [a] perpetual victim of her mother's alleged emotional abuse of her."  (*Id.*).  Dr. De Ferreire diagnosed Plaintiff with Borderline Personality Disorder, Persistent Depressive Disorder, parent-child relational problems, and with other problems related to her employment (finding that Plaintiff lacked in any self-worth that she is employable).  (*Id.*).

Dr. De Ferreire found, in regards to Plaintiff's functional capacity, that her mental capacity was intact due to being able to carry out simple/complex step instructions.  (*Id.*).  Plaintiff was able to sustain "reasonable" concentration.  (*Id.*).  Dr. De Ferreire opined that Plaintiff will be "unable to be socially active with others" and that Plaintiff will be "unable to deal with normal pressures of [a] competitive work setting due to—" with the sentence remaining unfinished.  (*Id.* at 99).  Dr. De Ferreire opined that Plaintiff was incapable of managing her disability benefits in her own interest.  (*Id.* at 99-100).

d.    <u>Examination by Dr. Gauri Kanhere</u>

On March 29, 2016, Plaintiff was examined by Dr. Gauri Kanhere for a disability examination.  (Dkt. No. 8-9 at 76).  Dr. Kanhere largely evaluated Plaintiff's physical impairments, which are not relevant to this Report and Recommendation.  Regarding her mental impairments,

Dr. Kanhere wrote that Plaintiff's last seizure was in 2004 and that Plaintiff denied experiencing any anxiety or depression. (*Id.* at 78).

The undersigned notes that in Plaintiff's letter Plaintiff described her visit with Dr. Kanhere and complained that Dr. Kanhere did not allow her an opportunity to talk or explain her symptoms. (Dkt. No. 8-7 at 71-75).

e.     Examination and Treatment by Dr. Rafael Valdez

Plaintiff saw Dr. Rafael Valdez on April 28, 2015, for complaints of chronic headaches and dizziness. (Dkt. No. 8-9 at 67). Dr. Valdez referred Plaintiff to a neurologist, Dr. Reza. (*Id.* at 65). Plaintiff again saw Dr. Valdez on June 11, 2015. (*Id.* at 60). Dr. Valdez prescribed her medication. (*Id.*).

On August 14, 2015, Plaintiff saw Dr. Valdez for lower back pain and joint pain. (*Id.* at 59). Dr. Valdez noted Plaintiff's history of depression, but did not appear to be treating her for her depression. (*Id.*). Dr. Valdez prescribed her medication for her physical pains. (*Id.* at 58). On September 17, 2015, Plaintiff saw Dr. Valdez for pain in her lower back and extremities. (*Id.* at 57). Again, Dr. Valdez noted "major depression" in his progress notes, but he did not appear to be treating Plaintiff for her depression. (*Id.*).

f.     Examination by Dr. Syed H. Reza

On May 29, 2015, Plaintiff visited Dr. Syed H. Reza. (Dkt. No. 8-9 at 53). On June 6, 2015, Plaintiff underwent an MRI scan of her brain. (Dkt. No. 8-9 at 43). No significant abnormalities were detected. (*Id.*). Plaintiff also underwent an MRI scan of her spine. (*Id.* at 44).

On June 9, 2015, Dr. Reza conducted an electroencephalogram test. (*Id.* at 46-47). On June 26, 2015, Dr. Reza examined Plaintiff for carpal tunnel, which is not relevant to this Report and Recommendation. (*Id.* at 49). And, on July 16, 2015, Dr. Reza marked in his notes that

Plaintiff had depression, her recent memory was abnormal, and her remote memory was normal. (*Id.* at 51).

g.   Emergency Room Visit

On June 10, 2015, Plaintiff visited the emergency room in response to a headache that had lasted for two days.  (Dkt. No 8-9 at 2-31).   Medication was administered and Plaintiff was discharged the same day.  (*Id.* at 15, 30).

h.   Other Examinations

Plaintiff filled out a SSA form regarding her recent medical treatment as of June 15, 2017, which denotes examinations or treatment given by other medical providers which are not included as part of the SSA record.  (Dkt. No. 8-8 at 14).   The BRBHC forms list Dr. Roger Contreras as Plaintiff's primary doctor, but no reports from or information on Dr. Contreras are in the record. (Dkt. No. 8-10 at 13).

i.   Non-Examining Sources

On June 28, 2016, Joel Forgus, Ph.D.—an agency physician—completed a disability determination explanation and mental RFC assessment. (Dkt. No. 8-4 at 7-9)   As part of the psychiatric review assessment, he found that Plaintiff had medically determinable mental impairments that did not satisfy the diagnostic criteria of the Listings. (*Id.*).   He found that Plaintiff had "moderate" restrictions in her activities of daily living, "moderate" difficulties in maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation.  (*Id.*).   Forgus wrote that "[a]lthough the claimant is somewhat limited by symptoms, the impact of these do not wholly compromise the ability to function independently, appropriately, and effectively on a sustained basis."  (*Id.*).   He further

found that Plaintiff's alleged limitations are "partially supported" by the medical evidence, but the alleged severity and limiting effects of those impairments "are not wholly supported." (*Id*.).

As part of the mental RFC assessment, Dr. Forgus found that Plaintiff was "not significantly limited" in her ability to remember locations and work-like procedures, "not significantly limited" in her ability to understand and remember very short and simple instructions, and "markedly limited" in her ability to understand detailed instructions. (*Id*. at 12). Regarding her ability to sustain concentration and persistence, Dr. Forgus found Plaintiff was "markedly limited" in her ability to carry out short and simple instructions and "moderately limited" in her ability to carry out detailed instructions. (*Id*.). Plaintiff was "not significantly limited" in her ability to maintain attention and concentration for extended periods, her ability to keep to a schedule, maintain regular attendance, and be punctual, her ability to sustain ordinary routine without supervision, or her ability to make simple work-related decisions. (*Id*.). She was "moderately limited" in her ability to complete a normal workday or workweek at a consistent pace without interruptions from her psychologically-based symptoms without an unreasonable amount of rest periods. (*Id*.).

Dr. Forgus found that Plaintiff had social interaction limitations, but Plaintiff was "not significantly limited" in her ability to interact appropriately with the general public, ability to accept instructions and criticism from supervisors, ability to ask simple questions or request assistance, or ability to maintain socially appropriate behavior and adhere to basic standards of neatness/cleanliness. (*Id*. at 12-13). Plaintiff was "moderately limited" in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id*.). Finally, regarding Plaintiff's adaptation limitations, Plaintiff was "not significantly limited" in her ability to be aware of normal hazards and take precautions, to travel to unfamiliar places or use public

transport, or to set realistic goals or plans independently of others. (*Id.*). She was "moderately limited" in her ability to respond appropriately to changes in the work setting. (*Id.*).

On August 16, 2016, Dr. Leela Reddy—an agency physician—completed another disability determination explanation and mental RFC assessment at the reconsideration level. (Dkt. No. 8-4 at 32). Dr. Reddy affirmed Dr. Forgus's psychiatric review. (*Id.* at 38-39). Dr. Reddy's mental RFC assessment did not differ from Dr. Forgus's in any dimension. (*Id.* at 41-43).

## C.    Cross Motions for Summary Judgment

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the parties file cross motions for summary judgment, as in the present case, the basic standard in Rule 56 remains the same. "Cross-motions must be considered separately . . ." and "[i]f there is no genuine issue [of material fact] and one of the parties is entitled to prevail as a matter of law, the court may render summary judgment." *Shaw Constructors v. ICF Kaiser Engineers, Inc.*, 695 F.3d 533, 538-39 (5th Cir. 2004).

### 1.    *Establishing Disability*

A Plaintiff is not entitled to DIB or SSI benefits unless he or she is "disabled" within the meaning of the Social Security Act. Disability is defined as "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine if a claimant is disabled, the Commissioner uses a five-step process:

(1) At the first step, the Commissioner considers the claimant's work activity, if any. If the claimant is performing substantial gainful activity, the Commissioner will automatically determine that the claimant is not disabled.
(2) At the second step, the Commissioner considers the medical severity of the claimant's impairments. If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement, the Commissioner will find that the claimant is not disabled.

(3) At the third step, the Commissioner again considers the medical severity of the claimant's impairments. If the claimant has an impairment that meets or equals one of the listings in Appendix 1 and meets the duration requirement, the Commissioner will automatically find the claimant disabled.

(4) At the fourth step, the Commissioner will consider the claimant's residual functional capacity and past relevant work. If the claimant can still do past relevant work, the Commissioner will find that the claimant is not disabled.

(5) At the fifth step, the Commissioner considers the claimant's residual functional capacity and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the Commissioner will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the Commissioner will find the claimant disabled.

20 C.F.R. § 404.1520(4).

In this inquiry, the claimant bears the burden of proof for the first four steps; the burden

shifts to the Commissioner on the fifth step to show that there is work in the national economy that

the claimant can perform notwithstanding her impairments. *Newton v. Apfel*, 209 F.3d 448, 453

(5th Cir. 2000). If the Commissioner satisfies this burden, the claimant must then prove that she

cannot perform the suggested work. *Id.*

2.  *Discussion of the ALJ's Decision*

The ALJ's decision is the final decision of the Commissioner of Social Security in

Plaintiff's case because the Appeals Council declined to review the case. *See Sims v. Apfel*, 530

U.S. 103, 106-07 (2000) ("SSA regulations provide that, if the Appeals Council grants review of the claim, then the decision that the Council issues is the Commissioner's final decision. But if, as here, the Council denies the request for review, the ALJ's opinion becomes the final decision."). The ALJ issued his decision on February 13, 2018. (Dkt. No. 8-3 at 16-26).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant time period. (*Id.* at 18).

At step two, the ALJ determined that Plaintiff had severe depressive order and anxiety disorder, along with the following severe physical impairments: left ankle tarsal tunnel, bilateral carpal tunnel syndrome, degenerative disc disease of the lumbar spine, migraine headaches, and obesity. (*Id.* at 18-19).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals any of the listed impairments. The ALJ found that Plaintiff's mental impairments, either alone or in combination, did not meet the criteria in the listings. (Dkt. No. 8-3 at 19). Specifically, Plaintiff failed to meet "12.04, *Depressive, bipolar and related disorders*" or "12.06, *Anxiety and obsessive-compulsive disorders*." (*Id.*). In evaluating a claimant with more than one impairment, the Commissioner must consider "whether the combination of . . . impairments is medically equal to any listed impairment." *Davis v. Soc. Sec. Admin.*, No. CV 15-5981, 2016 WL 11220477, at *4 (E.D. La. Dec. 21, 2016); 20 C.F.R. § 404.1526(a).

The regulations instruct that the mental disorder must satisfy the requirements of all paragraphs given for that disorder. 20 C.F.R. § 404, Subpt. P, App. 1 at 524.[16] Paragraph A

---

[16] The appendix to the Code of Federal Regulations can be found at the United States Government Publishing Office's website. Code of Federal Regulations, GOVINFO, https://www.govinfo.gov/app/collection/cfr.

provides the "medical criteria," while paragraph B provides "the functional criteria" which are assessed by using a rating scale to evaluate how the mental disorder limits the claimant's functioning.[17]  *Id.*  Paragraph B criteria refers to four designated areas of mental functioning a person uses in a work setting, which are: (B1) "understand, remember, or apply information;" (B2) "interact with others;" (B3) "concentrate, persist, or maintain pace;" (B4) and "adapt or manage oneself." *Id* at 524, 529-30.  The ALJ must determine the degree to which the alleged mental disorder affects these four areas of mental functioning.  *Id.*  To satisfy the "paragraph B criteria," the mental disorder must result in an "extreme" limitation of one of the four areas of mental functioning or "marked" limitation of two of the four areas.  *Id.* at 525.  The rating scale includes no limitation, mild limitation, moderate limitation, marked limitation, and to extreme limitation. *Id.* at 530.

Regarding Plaintiff's ability to understand, remember, or apply information, the ALJ found that Plaintiff was moderately limited. (Dkt. No. 8-3 at 19).  The ALJ noted that Dr. De Ferreire tested Plaintiff's memory and found that Plaintiff's short-term memory, long-term memory, and

---

[17] The following medical criteria are the Paragraph A criteria.  The listings define "[d]epressive, bipolar and related disorders" as:

> Disorders 'characterized by an irritable, depressed, elevated, or expansive mood, or by a loss of interest or pleasure in all or almost all activities, causing a clinically significant decline in functioning,' whose 'symptoms and signs may include, but are not limited to, feelings of hopelessness or guilt, suicidal ideation, a clinically significant change in body weight or appetite, sleep disturbances, an increase or decrease in energy, psychomotor abnormalities, disturbed concentration, pressured speech, grandiosity, reduced impulse control, sadness, euphoria, and social withdrawal.'

20 C.F.R. § 404, Subpt. P, App. 1 at 525.

The listings also define "[a]nxiety and obsessive-compulsive disorders" as:

> Disorders characterized by "excessive anxiety, worry, apprehension, and fear, or by avoidance of feelings, thoughts, activities, objects, places, or people.  Symptoms and signs may include, but are not limited to, restlessness, difficulty concentrating, hyper-vigilance, muscle tension, sleep disturbance, fatigue, panic attacks, obsessions and compulsions, constant thoughts and fears about safety, and frequent physical complaints.

20 C.F.R. § 404, Subpt. P, App. 1 at 526.

remote memory were intact. (*Id.*). Regarding Plaintiff's ability to interact with others, the ALJ found that Plaintiff was moderately limited. (*Id.* at 20). The ALJ noted that the claimant testified she had difficulty engaging in social activities and spending time in crowds. (*Id.*). On the other hand, Plaintiff testified she can go out shopping. (*Id.*). The ALJ found that the medical evidence showed Plaintiff could be cooperative and could establish rapport with others. (*Id.*). Regarding Plaintiff's ability to concentrate, persist, or maintain pace; the ALJ similarly found that Plaintiff was moderately limited. (*Id.*). The ALJ found that Plaintiff was not limited in her ability to adapt or manage herself. (*Id.*).

The ALJ found that, because Plaintiff failed to show her mental impairments caused at least one "extreme" limitation or two "marked" limitations, the paragraph B criteria were not satisfied. (*Id.* at 21). Plaintiff did not suffer from a mental impairment meeting or equaling an impairment in the listings. (*Id.*).

For those claimants whose disability "does not meet or equal a listed impairment," the Commissioner will "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence in your case record, as explained in § 404.1545." 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1520a(d)(3). This is because for impairments which fail to meet or equal the listings but are "nevertheless severe," individuals "may or may not have the residual functional capacity ("RFC") which would enable them to engage in substantial gainful work activity." *Richard v. Sec'y of Health & Human Servs.*, 894 F. Supp. 1045, 1053 (E.D. Tex. 1995); *Stearns v. Astrue*, No. 608-CV-074-CECF, 2010 WL 1072828, at *4 (N.D. Tex. Mar. 24, 2010) ("If the impairment is severe but does not reach the level of a listed disorder, then the ALJ must conduct an RFC assessment."). In sum, although Plaintiff's impairments failed to meet or equal a listed impairment at step three, because the ALJ

found her impairments were "severe" at step two, the ALJ nevertheless conducted an RFC assessment. "[E]ssentially the same impairment-related medical and nonmedical information is considered to determine whether the mental disorder meets listing severity as is considered to determine whether the mental impairment is of lesser severity, yet diminishes the individual's RFC." *Davis v. Soc. Sec. Admin., No. CV 15-5981*, 2016 WL 11220477, at *5 (E.D. La. Dec. 21, 2016) (citing Social Security Ruling 85-16, 1985 WL 56855 at *1).

The ALJ emphasized that the paragraph B analysis was not an RFC assessment, although the paragraph B limitations are incorporated into the RFC assessment. (Dkt. No. 8-3 at 21). The ALJ went on to perform a residual functional capacity assessment "reflect[ing] the degree of limitation the undersigned has found in the paragraph B mental functional analysis.' " (*Id.*). "Social Security regulations make clear that an ALJ must consider all of the relevant evidence in the claimant's file when formulating an RFC; such evidence necessarily includes 'paragraph B' limitations." *Prather v. Colvin*, No. A-12-CV-1075-AWA, 2014 WL 4187124, at *3 (W.D. Tex. Aug. 21, 2014).

At step four, the ALJ found that Plaintiff has the RFC to lift, carry, push, and pull 20 pounds infrequently and 10 pounds frequently; to stand and walk six hours and to sit for six hours in an eight-hour workday; to occasionally stoop, crouch, crawl, kneel, balance, and climb stairs; to grasp and finger frequently with both hands; to understand, remember, and carry out routine repetitive tasks; make decisions; maintain concentration and persistence long enough to complete routine, repetitive tasks; and to accept instructions. (Dkt. No. 8-3 at 21). The ALJ further specified that Plaintiff cannot climb ladders and that Plaintiff's "contact with coworkers and the public should be limited to occasional and be incidental to the work performed." (*Id.*). The ALJ discussed

Plaintiff's medical history in great detail, including Dr. De Ferreire's report. (*Id*. at 21-25). The ALJ found that Plaintiff had no past relevant work. (*Id*.).

At step five, the ALJ found, based on Plaintiff's residual functional capacity, the testimony of the vocational expert, and Plaintiff's age, education, and work experience, that Plaintiff is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," such as a housekeeper cleaner. (*Id*. at 25-26). The ALJ concluded that Plaintiff is not disabled. (*Id*. at 26).

### 3. *Plaintiff's Motion for Summary Judgment*

Plaintiff makes several arguments attacking the ALJ's decision. Plaintiff argues that the ALJ failed to appropriately weigh the opinion of Dr. De Ferreire, that the ALJ failed to explain what portions of Dr. De Ferreire's opinion he incorporated into Plaintiff's RFC, that the ALJ failed to explain how Plaintiff's social limitations will be accommodated by experiencing only occasional contact with coworkers or the public, and that the ALJ's hypothetical question posed to the vocational expert failed to incorporate Plaintiff's limitations. None of these arguments, however, warrant summary judgment in her favor.

First, Plaintiff argues that in affording Dr. De Ferreire's opinion "some weight," the ALJ violated the social security regulations which state that the SSA will "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." (Dkt. No. 13 at 14 (citing 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1))). The ALJ did give more weight to Dr. De Ferreire's opinion than he did to non-examining sources. The ALJ afforded De Ferreire's opinion "some weight" and afforded the state agency psychological consultants' opinions "little weight." (Dkt. No. 8-3 at 25). The ALJ found that the state agency psychological consultants' opinions should be given less weight because they were inconsistent with Plaintiff's

subjective allegations and evidence supporting Plaintiff's need for ongoing mental health treatment. (*Id*.). Plaintiff cannot show the ALJ erred in this aspect because the ALJ *did* afford Dr. De Ferreire's opinion more weight than he did to that of the non-examining consultants. Plaintiff does not assert that Dr. De Ferreire's opinion should have been accorded controlling weight—Dr. De Ferreire examined Plaintiff on one occasion and was not a treating physician.[18]

Second, Plaintiff argues that, regarding the RFC analysis, the ALJ credited certain portions of Dr. De Ferreire's opinion and disregarded other portions of Dr. De Ferreire's opinion without explanation. (Dkt. No. 13 at 13, 17). Specifically, Plaintiff alleges that the ALJ failed to address Dr. De Ferreire's opinion about "Plaintiff's ability to perform work" because Plaintiff would "be unable to be socially active with others," "unable to deal with normal pressures in a competitive work setting," and "unable to manage benefits in her own best interests." (*Id*.). It is true that an ALJ is required by statute to set forth "in understandable language" "a statement of the case" which includes "a discussion of the evidence," "the Commissioner's determination," and "the reason or reasons" for the determination. 42 U.S.C. § 405. This does not mean, however, that the ALJ must engage in an "exhaustive point-by-point discussion" in his opinion. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). "The ALJ does not need to comment on every piece of evidence, but only must build an accurate and logical bridge between the evidence and the final determination." *Price v. Astrue*, 401 F. App'x 985, 986 (5th Cir. 2010); *Herring v. Astrue*, 788 F. Supp. 2d 513, 522 (N.D. Tex. 2011) (rejecting argument that ALJ needed to quote from a particular section of report).

---

[18] A "treating source" is an "acceptable medical source" who provided a claimant with medical treatment or evaluation and who had an "ongoing treatment relationship" with the claimant with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for the claimant's medical condition. 20 C.F.R. § 404.1527(a)(2). Generally, the regulations require more weight to be given to opinions from treating sources because they have more familiarity with the plaintiff's conditions. 20 C.F.R. § 404.1527(c)(2).

To begin with, any physician's opinion on a claimant's "ability to perform work" is not significant because it is an opinion on an issue that is reserved to the Commissioner. "[T]he ALJ has sole responsibility for determining a claimant's disability status." *Cain v. Barnhart*, 193 F. App'x 357, 360 (5th Cir. 2006); 20 C.F.R. § 404.1527(d)(2)-(3). Furthermore, it does not appear that Dr. De Ferreire opined that Plaintiff would be unable to work. As highlighted by Plaintiff, Dr. De Ferreire specifically opined that Plaintiff would be "unable to be socially active with others," "unable to deal with normal pressures in a competitive work setting," and "unable to manage benefits in her own best interests." These particular opinions will be addressed in turn.

Plaintiff argues that the ALJ did not address Dr. De Ferreire's opinion that Plaintiff is "unable to be socially active with others" as part of the RFC analysis. This criterion belongs to the paragraph B analysis not the RFC analysis (although the paragraph B limitations are then incorporated into the RFC determination). The ALJ addressed Plaintiff's ability to be social with others in step three (encompassed in (B2) "interact with others"). During the step three analysis, the ALJ specifically took note of and cited to Dr. De Ferreire's report, stating that Plaintiff was "described as cooperative and established rapport," but that Plaintiff would not be able to be "socially active with others." (Dkt. No. 8-3 at 20). The ALJ found that Plaintiff was indeed moderately limited in her ability to interact with others.

Dr. De Ferreire's notes state that Plaintiff maintains friendships, that Plaintiff gets along with some family members, and that Plaintiff gets along with people of authority. (Dkt. No. 8-9 at 93). Although Dr. De Ferreire concluded that Plaintiff would be "unable to be socially active with others," this general opinion does not correspond to any particular Paragraph B severity level. It is unclear what level of severity is connoted by this short, conclusory statement. Concluding that Dr. De Ferreire intended to denote an absolute or "extreme" limitation in this area would be

inconsistent with her own examination notes. Rather, Dr. De Ferreire's examination supports that Plaintiff is moderately limited in her ability to socialize with others.[19]

Plaintiff also contends that the ALJ ignored Dr. De Ferreire's opinion that Plaintiff is "unable to deal with normal pressures in a competitive work setting." (*Id.* at 99). In making the RFC assessment, the ALJ cites to Dr. De Ferreire's report, stating that "[t]he consulting psychologist further noted the claimant could be unable to deal with normal pressures of [a] competitive work setting." (Dkt. No. 8-3 at 24). The ALJ then went on to state that he "accords this opinion some weight, as is generally consistent with the minimal evidence of functional impairments arising from the claimant's mental impairments." (*Id.* (emphasis added)). Thus, the ALJ explained that he afforded Dr. De Ferriere's opinion the weight he believed it was entitled to, to the extent that it was consistent with other evidence of Plaintiff's functional impairments— evidence which he found to be minimal. Although Plaintiff may have wished the ALJ to have engaged in a lengthier explanation, perfection is not required. *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017).

The ALJ was free to give less weight to or disregard Dr. De Ferreire's opinion that Plaintiff is "unable to deal with normal pressures in a competitive work setting" because he found it to be unsupported by other record evidence. "[L]ess weight, little weight, or even no weight may be given to the physician's testimony" for good cause. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). Recognized good causes include "disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Id.*; *Newton*, F.3d at 455 ("[An] ALJ is free to reject the

---

[19] As an aside, in May of 2016, Dr. De Ferreire stated that Plaintiff did not go grocery shopping; rather, Plaintiff's husband did all of the shopping. (Dkt. No. 8-9 at 93). Plaintiff testified in December of 2017 that she did go grocery shopping with her husband. (Dkt. No. 8-3 at 64).

opinion of any physician when the evidence supports a contrary conclusion.") (*quoting Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)); *see also* 20 C.F.R. § 404.1520b(b) ("We consider evidence to be inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques."). Furthermore, Dr. De Ferriere's opinion is brief and conclusory.[20] Dr. De Ferreire simply writes that Plaintiff is "unable to deal with normal pressures in a competitive work setting due to . . . ." (Dkt. No. 8-9 at 99). The sentence is unfinished. Conclusory statements may be disregarded. *Greenspan*, 38 F.3d at 237; *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995) (finding ALJ had good cause to place little weight on an "isolated, conclusory statement").

Next, Plaintiff contends that the ALJ ignored Dr. De Ferreire's opinion that Plaintiff would be "unable to manage benefits in her own best interests." The relevance of this opinion is dubious because Plaintiff does not contend that she is legally incompetent. Dr. De Ferreire noted that Plaintiff would not be able to "manage benefits in her own best interests," but that Plaintiff did "understand the meaning of filing for benefits." (Dkt. No. 8-9 at 99). This opinion falls under the heading "Capability Statement." (*Id.*). "Capability refers to a beneficiary's ability to manage or direct the management of his or her Social Security benefits." GN 00502.001, Program Operations Manual System, https://secure.ssa.gov/poms.nsf/lnx/0200502001 (last visited December 2, 2019). The regulations instruct that every beneficiary has a right to manage his or her own benefits. 20 C.F.R. § 404.2001(b). However, in the event that a claimant is incapable of managing their benefits, a third party representative will be appointed to manage the claimant's social security

---

[20] To be clear, medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgment about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527.

benefits. 20 C.F.R. § 404.2001(b)(2)-(3). In other words, Dr. De Ferreire opined that Plaintiff was incompetent and unable to manage her social security benefits, should they be awarded to her; however, she gave no opinion on Plaintiff's ability to adapt or manage *herself* as is relevant to the five-step disability analysis. The record does not show that Plaintiff's competency was ever brought up as an issue before the ALJ. Plaintiff's counsel does not now assert that Plaintiff is incapable of managing her benefits. Therefore, there is no reason why the ALJ would discuss capability in his opinion.

By contrast, there is nothing in Dr. De Ferreire's examination notes that supports the conclusion that Plaintiff is unable to manage herself. *Self*-management or self-adaptation is an area of mental functioning that refers to the person's ability to "regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. § 404, Subpt. P, App. 1 at 530. Examples of functioning in this area include "responding to demands," "adapting to changes," "distinguishing between acceptable and unacceptable work performance," and maintaining "personal hygiene and attire appropriate to a work setting." *Id.* Dr. De Ferreire found that Plaintiff's judgment was intact, her behavior was neutral, her hygiene was adequate, and she was able to understand and attempt to follow Dr. De Ferreire's memory test instructions. *Id.* Dr. De Ferreire's report, cited to by the ALJ, supports the ALJ's finding that Plaintiff was not limited in her ability to adapt or manage herself. (Dkt. No. 8-3 at 20).

Thus, a review of the ALJ's opinion and the record shows that the ALJ did not ignore Dr. De Ferreire's report without explanation. The ALJ was not required to exhaustively mention every portion of the report, let alone irrelevant portions of the report. The ALJ cited to portions of the report he found pertinent and had good cause to afford Dr. De Ferriere's opinion "some" weight.

Third, Plaintiff appears to contest the ALJ's determination that occasional contact with coworkers and the public would accommodate Plaintiff's social limitations. (Dkt. No. 13 at 17). Plaintiff argues that the ALJ did not explain "how only occasional contact with coworkers and the public accommodates [her] limitations." (*Id.*). Plaintiff points to her "PTSD and fear of unknown males" and suggests possible impact on her "ability to be supervised" or "deal with work pressure." (*Id.*). As previously stated, an ALJ is not required to do an exhaustive point-by-point discussion. *Audler*, 501 F.3d at 448. Even assuming *arguendo* that the ALJ should have touched on these points, failure to do so does not automatically warrant remand because insufficient explanation can be harmless. *Id.*; *Belk v. Colvin*, 648 F. App'x 452, 455 (5th Cir. 2016). The "procedural improprieties" alleged by Plaintiff will only constitute a basis for remand "if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In this case, the undersigned finds that the failure to discuss these points in detail does not cast that into doubt.

There is no evidence to suggest Plaintiff is limited in her ability to be supervised. Plaintiff has self-reported that she gets along with authority figures "well" and "very good, I am a polite person." (Dkt. No. 8-7 at 55, 38). Dr. De Ferreire's examination notes also state that Plaintiff gets along with people of authority. (Dkt. No. 8-9 at 93).

Substantial evidence supports the conclusion that Plaintiff's anxiety and paranoia are not disabling. Plaintiff testified that she feels uncomfortable being in public or around male strangers, but the record evidence demonstrates that Plaintiff is able to exhibit socially appropriate behavior and maintain relationships. There is no evidence indicating Plaintiff cannot engage in conversation

or that she cannot understand or respond to social cues.[21]  By comparison, a claimant might exhibit

marked or extreme limitations in their ability to appropriately socialize with others because they

have a history of becoming physically violent towards others.[22]  The ALJ did not disagree with

Plaintiff's subjective evidence that she felt anxious or uncomfortable being in public or around

male strangers; the record evidence indeed demonstrates that Plaintiff suffers from anxiety and

experiences discomfort.  Yet, it is "important to note that the test for disability under the Social

Security Act is not satisfied merely because Plaintiff cannot work without some pain or

discomfort." *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983); *Lloyd v. Astrue*, No. 8:11-CV-

2257-T-33TGW, 2012 WL 4865401, at *3 (M.D. Fla. Sept. 20, 2012) (noting that disability is not

determined by simply having an impairment, but rather, functional limitations from that

impairment).

Furthermore, although Plaintiff relies heavily on Dr. De Ferreire's examination, Dr. De

Ferreire fails to mention a fear of male strangers at all.[23]  Dr. De Ferreire noted that Plaintiff

"denied current/past phobias" and "denied any feelings of anxiety."  (Dkt. No. 8-9 at 97).  Dr. De

Ferreire provides only the conclusory statement that Plaintiff is unable to be "socially active" with

---

[21] Other examples of functioning related to interacting with others include initiating and maintaining friendships, cooperating with others, and handling conflicts with others. *See* 20 C.F.R. § 404, Subpt. P, App. 1 at 530.

[22] *Stearns v. Astrue*, No. 608-CV-074-CECF, 2010 WL 1072828, at *5 (N.D. Tex. Mar. 24, 2010) (examiner found that plaintiff had marked limitations in ability to interact appropriately with public, supervisors, and co-workers and extreme limitation in ability to respond to appropriately to work pressures); *Lloyd v. Astrue*, No. 8:11-CV-2257-T-33TGW, 2012 WL 4865401, at *3 (M.D. Fla. Sept. 20, 2012).

[23] It should be additionally noted that Dr. De Ferriere's opinion (based on a single examination on May 23, 2016) was not reflective of Plaintiff's level of functioning after she began taking psychotropic medication in 2017.  The ALJ was warranted in affording Dr. De Ferreire's opinions less weight for this reason as well. *See, e.g., Loeb v. Colvin*, 130 F. Supp. 3d 898, 911 (D. Del. 2015) (finding that the ALJ acted reasonably in affording little weight to doctor's opinion which was inconsistent with level of functioning after Plaintiff's symptoms improved with treatment and medication).  In fact, Plaintiff had not been examined by any consultative physician after Plaintiff began treatment by Dr. Dietz.  A consultative exam is ordered by the Social Security Administration if the claimant's own medical sources are not enough to determine if she is disabled. *See* 20 C.F.R. § 404.1512(b)(2).

others; otherwise, Dr. De Ferreire's examination notes depict Plaintiff as someone who gets along with others and is able to maintain relationships with friends and family. (*Id.* at 93). Plaintiff reported she "never got stressed out at work." (*Id.*). In sum, outside of the conclusory statements tacked on the end of the report, Dr. De Ferreire's examination notes do *not* paint Plaintiff as someone who is unable to be supervised, unable to socialize with her coworkers or the public, or someone who cannot handle ordinary work pressures. Dr. De Ferreire's conclusions are noticeably inconsistent with her examination notes.

The substantive medical documentation regarding Plaintiff's anxiety and paranoia symptoms comes from Border Region Behavioral Health Center. Plaintiff began treatment at the BRBHC in December of 2016, continuing throughout 2017, and up to the point of the hearing before the ALJ (which was held December 7, 2017). Under treatment recommendations, Plaintiff's December 2016 intake report states that "medications will help decrease symptoms." (Dkt. No. 8-10 at 14). The record shows that Dr. Diez was still in the process of finding the right combination and dosage of psychotropic medications for Plaintiff.

As mentioned in Dr. Diez's notes, Plaintiff suffered from paranoid or persecutory delusions, i.e. she felt paranoid and uncomfortable in public because she feels "[people] want to hurt her." (Dkt. No. 8-10 at 41). Plaintiff responded well to some medications and saw a decrease in her anxiety and paranoia while on medication. (Dkt. No. 8-10 at 16-17, 32-35, 70). Plaintiff underwent treatment with BRBHC for just under a year. Plaintiff experienced a marked backslide when, for roughly a month, she went without her medications. (*Id.* at 56, 61). Once Plaintiff returned to treatment in October of 2017, Plaintiff's symptoms improved by the next month. (*Id.* at 70). The last documented progress report completed by Dr. Diez (November 8, 2017) showed that Plaintiff reported the anxiety medication was helping and that she was able to sleep better and

relax; she still felt depressed and believed the depression medication was not strong enough[24]; and, notably, she was *not* experiencing hallucinations or paranoid thoughts. (*Id.*). Thus, the most up-to-date medical documentation of Plaintiff's mental health status in the record depicts decreased anxiety and paranoia symptoms with medication.

The fact that an impairment responds to medication or treatment may be considered in the disability determination. *Muckelroy v. Astrue*, 277 F. App'x 510, 512 (5th Cir. 2008) (unpublished); *Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir. 1990) ("Since [claimant's] pain was alleviated by medication, the Secretary correctly found it not to be disabling."); *Clevenger v. Soc. Sec. Admin.*, 567 F.3d 971, 976 (8th Cir. 2009); *Sangel v. Astrue*, 785 F. Supp. 2d 757, 777 (N.D. Iowa 2011) (claimant's medication controlled her anxiety and depression); 20 C.F.R. § 404.1529(c)(3) (factors relevant to evaluation of symptoms include treatment that claimant has received and any measures claimant has used to relieve symptoms). "Those medical conditions that can be reasonably remedied by either surgery, treatment or medication cannot support a finding of disability." *Amburgey v. Barnhart*, 288 F. Supp. 2d 821, 833-34 (S.D. Tex. 2003) (claimant capable of performing sedentary work when mental condition controlled by medication); *Johnson v. Bowen*, 864 F.2d 340, 346 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986); *Knox v. Finch*, 427 F.2d 919, 921 (5th Cir. 1970) ("The rule is well settled 'that a claimant who has a disabling impairment which can reasonably be classified as remediable is not entitled to receive disability benefits.' "); *Acosta v. Astrue*, 865 F. Supp. 2d 767, 791 (W.D. Tex. 2012) ("An impairment that can be

---

[24] Plaintiff testified at the hearing before the ALJ that her doctor had switched her to a new depression medication the day before the hearing. (Dkt. No. 8-3 at 42).

reasonably remedied or controlled by medication or treatment is not disabling and does not affect RFC.").[25]

Of course, especially in the context of mental health issues, it is common for symptoms to wax and wane in the course of treatment. Periods of improvement should be treated with caution. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("Reports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms."); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better . . . does not imply that the condition has been treated."). Regardless, "[t]he mere mention of mental health impairments in the medical record does not establish that [claimant] is disabled. . . . [the claimant] is required to point to medical evidence that her mental health symptoms waxed and waned in a manner that precluded employment . . . ." *Naona N.E. v. Berryhill*, No. 3:17-CV-0597-D-BK, 2018 WL 5722677, at *7 (N.D. Tex. Aug. 20, 2018); *Crainey v. Astrue*, No. 4:11-CV-613-A, 2012 WL 5846406, at *7 (N.D. Tex. Nov. 1, 2012). In this case, Plaintiff has not shown that her mental health symptoms wax and wane in a way that precludes employment even while on medication. "It must be remembered that an individual claiming disability insurance benefits under the Social Security Act has the burden of proving her disability." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).

---

[25] Dr. Diez also consistently recommended therapy or counseling for Plaintiff's mental health issues as part of Plaintiff's treatment plan. (*E.g.*, Dkt. No. 8-10 at 29, 45-46, 77). Although therapy was recommended and not "prescribed," *see* 20 C.F.R. § 404.1530(a) ("In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work."), Plaintiff has submitted no evidence showing whether she has complied with this dimension of her physician's treatment plan or not.

In light of the above, even assuming, *arguendo*, that the ALJ's failure to discuss in detail Plaintiff's paranoia of male strangers or ability to be supervised was in error, that error was harmless. It does not cast doubt on the existence of substantial evidence to support the ALJ's determination.

Finally, Plaintiff argues that the ALJ's hypothetical question asked of the vocational expert was defective because it failed to adequately incorporate Plaintiff's limitations. Plaintiff contends that the ALJ did not encompass Plaintiff's "inability to be social with others" or her "inability to deal with normal pressures in a competitive work setting" in his hypothetical question. (Dkt. No. 13 at 18). "An ALJ's hypothetical is defective unless: (1) it incorporates reasonably all disabilities of the claimant recognized by the ALJ, and (2) the claimant or his representative is afforded the opportunity to correct deficiencies in the hypothetical." *Hardman v. Colvin*, 820 F.3d 142, 148 (5th Cir. 2016) (internal quotations omitted).

Plaintiff does not show that the ALJ failed to reasonably incorporate the "disabilities . . . recognized by the ALJ." *Id.* As already stated, the ALJ did not need to blindly accept Dr. De Ferreire's statement that Plaintiff would be unable to deal with normal pressures in a competitive work setting. The ALJ explained that her opinion was inconsistent with other evidence of Plaintiff's functional impairments. Additionally, the undersigned notes the opinion was conclusory. The ALJ only recognized a moderate limitation in Plaintiff's ability to interact with others.

The record shows that the ALJ asked the vocational expert to "assume a person that is 32 years of age, with a limited education, and no past relevant work experience" and to "[a]ssume . . . psychological limitations would limit the individual to being able to understand, remember, and [carry] out routine, repetitive tasks, make decisions, and maintain concentration and persistence

long enough to complete routine, repetitive tasks; is able to accept instruction, but contact with coworkers and the public should be limited to occasional and be incidental [to] the work performed." (Dkt. No. 8-3 at 77). For every hypothetical thereafter, the ALJ asked the vocational expert to assume the same psychological limitations. (*Id.* at 78-80). Thus, the hypothetical questions reasonably incorporated Plaintiff's mental impairments.

Plaintiff also does not contend that she or her representative were denied the opportunity to correct any perceived deficiencies in the hypothetical. The record shows that after the ALJ posed multiple hypotheticals to the vocational expert, Plaintiff's attorney, Ms. Saltzman, was allowed the opportunity to question the vocational expert. (Dkt. No. 8-3 at 80-82). Ms. Saltzman posed multiple hypotheticals focused on an individual's ability to stay on task. (*Id*). Ms. Saltzman did not pose any hypotheticals touching upon the level of contact with coworkers or the public, or an individual's ability to deal with normal pressures in a work setting. The record shows Plaintiff had an opportunity to correct any deficiencies in the hypotheticals. Plaintiff's argument regarding the vocational hypothetical fails.

4.    *Defendant's Motion for Summary Judgment*

The Defendant responds to Plaintiff's summary judgment motion by arguing that substantial evidence supports the ALJ's mental RFC determination. (Dkt. No. 14 at 3; Dkt. No. 18 at 1). As stated above, the district court's review is limited to "whether (1) the [final] decision is supported by substantial evidence and (2) [that] proper legal standards were used to evaluate the evidence." *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999) (internal quotation marks omitted). Without exhaustively repeating a discussion of the entire administrative proceedings and record, the undersigned finds that substantial evidence in the record supports the ALJ's determination that

Plaintiff is not disabled within the meaning of the Act and that the ALJ used the proper legal standards.

## IV.  CONCLUSION

### *Recommended Disposition*

For the above reasons, the undersigned respectfully recommends that Plaintiff's request to amend her complaint (Dkt. No. 12) be **GRANTED**, Plaintiff's motion for summary judgment (Dkt. No. 12) be **DENIED**, that the Commissioner's motion for summary judgment (Dkt. No. 18) be **GRANTED**, that the Commissioner's decision be **AFFIRMED**, and this case be **DISMISSED**.

### *Notice to the Parties*

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  Failure to file written objections within fourteen (14) days after service shall bar an aggrieved party from de novo review by the District Court on an issue covered in this report and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of clear error or manifest injustice.

The Clerk of this Court shall forward a copy of this report to the parties by any receipted means.

SIGNED this 26th day of December, 2019, at McAllen, Texas.

J. SCOTT HACKER
United States Magistrate Judge